**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500

*Attorneys for Plaintiff Kerri F. Kellerman*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KERRI F. KELLERMAN,<br><br>　　　　　　　　　　*Plaintiff,*<br><br>　　　v.<br><br>CITY OF EAST ORANGE; COUNTY OF ESSEX; ALFARO ORTIZ, DIRECTOR OF ESSEX COUNTY DEPARTMENT OF CORRECTIONS, *in his individual capacity*; DAVID BOYD, DEPUTY DIRECTOR OF ESSEX COUNTY DEPARTMENT OF CORRECTIONS, *in his individual capacity*; CHARLES E. GREEN, WARDEN OF ESSEX COUNTY CORRECTIONAL FACILITY, *in his individual capacity*; JOHN AND JANE DOE POLICE OFFICERS #1-10, *in their individual capacities*; JOHN AND JANE DOE CORRECTIONS OFFICERS #1-20, *in their individual capacities*; *and* JOHN AND JANE DOE CFG EMPLOYEES #1-5, *in their individual capacities*.<br><br>　　　　　　　　　　*Defendants.* | Civil Action No. 2:18-4124 (MCA) (MAH)<br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kerri F. Kellerman ("Plaintiff" or "Ms. Kellerman"), by and through her counsel, Lowenstein Sandler LLP, brings this civil rights action under 42 U.S.C. § 1983 and state law, against Defendants City of East Orange; County of Essex; Alfaro Ortiz ("Ortiz"), Director of the Essex County Department of Corrections (the "ECDOC"), in his individual capacity;

David Boyd ("Boyd"), Deputy Director of ECDOC, in his individual capacity; Charles E. Green ("Green"), Warden of the Essex County Correctional Facility (the "ECCF" or "Essex County Jail"), in his individual capacity; John and Jane Doe Police Officers #1-10, in their individual capacities; John and Jane Doe Corrections Officers #1-20, in their individual capacities; and John and Jane Doe CFG Employees #1-5, in their individual capacities  (collectively, "Defendants"), in order to remedy violations of the rights afforded to her under the Fourth and Fourteenth Amendments to the United States Constitution, the New Jersey Constitution, the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq*., and hereby alleges as follows:

## **INTRODUCTION**

1.     Kerri Kellerman is a transgender woman.  For nearly two decades, Ms. Kellerman has identified, expressed, presented herself, and lived her daily life as a woman.  The gender designation on her birth certificate and other identity documents, including her state-issued identification, is "female."  Under the eyes of the law and the United States and New Jersey Constitutions, Ms. Kellerman is entitled to the same rights, protections, and privileges afforded to cisgender women, and to be free from discrimination based on her gender identity and expression.  Defendants, however, deliberately and maliciously violated those rights, causing Ms. Kellerman significant harm.

2.     From February 5 to on or about February 7, 2016, Ms. Kellerman was in the custody of the East Orange Police Department ("EOPD") and detained at EOPD Headquarters. From February 7 to February 24, 2016, Ms. Kellerman was in the custody of ECDOC and incarcerated at Essex County Jail.

3.     Throughout her detention, Ms. Kellerman repeatedly identified herself as "legally female" to Defendants John and Jane Doe Police Officers (collectively, the "EOPD Police

Officers") and Defendants John and Jane Doe Corrections Officers (collectively, the "ECDOC Corrections Officers," and together with the EOPD Police Officers, the "Defendant Officers") responsible for her custody, and requested that she be housed with female inmates/detainees. Ms. Kellerman feared that, as a transgender woman, she would be subject to harassment, abuse, and physical harm if housed in the same unit as male inmates/detainees.[1]

4.    At each step of her detention, Ms. Kellerman's female gender identity and legal status went unrecognized, and her housing requests were ignored.  Ultimately, Ms. Kellerman's worst fears materialized.

5.    Under the policies, practices, and/or customs of EOPD and ECDOC, housing units are sex-segregated and detainees are categorized as either "male" or "female" based on their external genital characteristics or assigned sex at birth, regardless of their gender identity, presentation, or their legal status.  This strict genitalia-driven approach to classification and attendant housing assignments means that transgender women, like Ms. Kellerman, are forced to shower, sleep, and live among male inmates and detainees.

6.    Defendant Officers and Defendants John and Jane Doe CFG Employees (the "CFG Employees") knew that Ms. Kellerman was a transgender woman.  In addition to Ms. Kellerman's feminine name, appearance, and presentation:  she repeatedly communicated to them that she was "legally female"; the sex designation on her New Mexico identification card was "female"; and she informed medical professionals at ECCF that she was taking the medically-prescribed, feminizing hormone therapy medications Estradiol and Spironolactone.

---

[1] Throughout the First Amended Complaint, the terms "inmate," "detainee," and "prisoner" are used interchangeably to refer to an individual who is incarcerated.

7.     Despite Ms. Kellerman's pleas, Defendant Officers and Defendant CFG Employees refused to treat Ms. Kellerman as a female throughout her detention, resulting in a litany of humiliations, trauma, and violations of Ms. Kellerman's constitutional rights.

8.     To begin, Ms. Kellerman was subjected to multiple invasive and humiliating cross-gender searches and medical examinations. These searches were conducted solely for the purpose of observing and fondling Ms. Kellerman's genital area in order to determine her biological sex, in violation of her civil rights and applicable policies and regulations. Ms. Kellerman was also forced to dress and shower in front of several male inmates and male ECDOC Corrections Officers.

9.     Based on these unlawful searches alone, the ECDOC Corrections Officers ignored Ms. Kellerman's requests to be housed with females and placed her in Essex County Jail's male general population unit. Within hours of her placement in the male general population unit, male detainees verbally and physically harassed Ms. Kellerman, and, on several occasions, they exposed their genitals to her in a threatening manner.

10.    Ms. Kellerman informed the ECDOC Corrections Officers of the harassment, threats, and physical and emotional abuse inflicted by male inmates in the general population unit. These Defendants turned a deliberate blind eye to her complaints and, in some instances, laughed at and encouraged the harmful behavior.

11.    Even after Ms. Kellerman informed the ECDOC Corrections Officers that she was having panic attacks because of the sexual abuse that she sustained in the male general population unit, they refused to place Ms. Kellerman in a female unit or in an environment where she could safely reside and interact with other inmates and detainees. Instead, she was placed in

a male-occupied protective custody unit, which, in effect, was a solitary confinement unit for male inmates.[2]

12.    Ms. Kellerman did not knowingly consent to placement in solitary confinement at EOPD or Essex County Jail.  Throughout her detention, Ms. Kellerman was never provided with an opportunity to contest her placement in solitary confinement, either in writing or through a hearing.  Indeed, the Defendant Officers never explained the reasoning for Ms. Kellerman's placement in solitary confinement.

13.    Ms. Kellerman spent almost the entirety of her 19 days in pre-trial custody in solitary confinement.  The devastating effects of isolation are well-established among mental health experts, physicians, and corrections officials, including Defendants.  Indeed, over a century ago, the United States Supreme Court recognized that:

> [Prisoners subject to solitary confinement] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

> *In re Medley,* 134 U.S. 160, 168 (1890).

There is consensus that inmates subjected to solitary confinement, even for a relatively short amount of time, risk severe emotional, psychological and physiological damage.[3]

---

[2] Under the United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules"), "solitary confinement" is defined as "confinement of prisoners for 22 hours or more a day without meaningful human contact," and "prolonged solitary confinement" is defined as "a time period in excess of 15 consecutive days." U.N. OFFICE ON DRUGS & CRIME, *The United Nations Standard Minimum Rules for the Treatment of Prisoners* ("Mandela Rules"), R. 44 at 14, goo.gl/cPT93i; *see also Wilkinson v. Austin,* 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); *Tillery v. Owens,* 907 F.2d 418, 422 (3d Cir. 1990) (describing solitary confinement as limiting human contact for 21 to 22 hours per day).

14.     But even placing Ms. Kellerman in solitary confinement was not enough to protect her from harm at Essex County Jail.  From the moment she stepped onto ECCF's male-occupied protective custody unit and walked past other inmates on the way to her cell, they began taunting and threatening her—all in the presence of ECDOC Corrections Officers.

15.     Two days later, one of the more vocal inmates accessed her cell through the food tray slot and spent the better part of an hour throwing human excrement, urine, refuse, rotting food, and possibly semen, on Ms. Kellerman.  During the assault, the ECDOC Corrections Officers—who should have been regularly monitoring the unit—stood idly by and ignored her calls for help.  Instead of fulfilling their constitutional duties to protect Ms. Kellerman from harm, the ECDOC Corrections Officers responded by laughing at her when they saw her covered in human waste.

16.     Defendants City of East Orange, County of Essex, and the CFG Employees who searched and examined Ms. Kellerman for the purpose of determining her biological sex violated the Prison Rape Elimination Act ("PREA"), 28 C.F.R. § 115.15 (e), New Jersey law, N.J.S.A. 2A:161A, Article I of the New Jersey Constitution, the Fourth Amendment to the United States Constitution.

---

[3] *See*, *e.g.*, Alison Shames et al., *Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives*, VERA INST. OF JUSTICE 17 (May 2015), goo.gl/tmH1nc (noting that after only seven days in solitary confinement, prisoners experience a range of symptoms including "hypersensitivity to stimuli, distortions and hallucinations, increased anxiety and nervousness, diminished impulse control, severe and chronic depression, appetite loss and weight loss, heart palpitations, talking to oneself, problems sleeping, nightmares, [and] self-mutilation."), Stuart Grassian, *Psychiatric Effects of Solitary Confinement,* 22 WASH. UNIV. J.L. & POL'Y 325, 338 (2006) ("By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of a voluminous medical literature."); Ass'n of State Corr. Adm'rs et al., *Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms*, YALE LAW SCHOOL ARTHUR LIMAN PUBLIC INTEREST PROGRAM 22 (Nov. 2016), https://law.yale.edu/system/files/area/center/liman/document/aimingtoreducetic.pdf.

17.     Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green failed in their duties to protect Ms. Kellerman from a substantial risk of harm, in violation of the Fourteenth Amendment to the United States Constitution.  Their policies, practices, and/or customs of knowingly placing a transgender woman in male-only units at EOPD and Essex County Jail, and failure to train and supervise the Defendant Officers, created an environment that led to harassment, threats, and an assault on Ms. Kellerman that resulted in significant harm to her.  Moreover, the ECDOC Corrections Officers who were responsible for monitoring Ms. Kellerman's protective custody unit and failed to intervene during her assault are individually liable for violating the Fourteenth Amendment.

18.     Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green's policy, practice, and/or custom of placing transgender inmates in solitary confinement violated Ms. Kellerman's constitutional right under the Fourteenth Amendment of the Unites States Constitution to humane conditions of confinement.  It also deprived her of liberty without due process of law in violation of the Fourteenth Amendment.

19.     Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green's policies, practices, and/or customs that led to Ms. Kellerman's placement in the male general population unit and solitary confinement unit were irrational and violated her fundamental rights to autonomy and privacy, including her right to live as a woman consistent with her female gender identity.  By disregarding Ms. Kellerman's status as a woman (legal and otherwise) and female gender identity, and denying her the right to be housed with other females, these Defendants violated the Due Process and Equal Protection Clauses of the United States Constitution, Article I of the New Jersey Constitution, and the NJLAD.

20.     Ms. Kellerman suffered sexual abuse and harassment, and irreparable harm, including severe and lasting emotional distress, humiliation, anxiety, psychological injury resulting in past and future mental anguish, past and future pain and suffering, and aggravation of preexisting injuries.  The severe harm she suffered as a result of Defendants' conduct while detained at EOPD and Essex County Jail have contributed to and/or resulted in diagnoses of depression, anxiety, Post-Traumatic Stress Disorder, and Agoraphobia.  Ms. Kellerman is entitled to compensatory and punitive damages in an amount to be proven at trial.

21.     Based on these violations, Ms. Kellerman brings this civil rights action against Defendants, seeking damages and declaratory relief.  Ms. Kellerman asserts claims under Section 1983 for violations of the rights afforded to her under the Fourth and Fourteenth Amendments to the United States Constitution.  Ms. Kellerman also asserts claims for violations of the New Jersey Constitution, the NJCRA, and the NJLAD.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction upon federal district courts in suits seeking to redress the deprivation of rights secured by the United States Constitution and laws of the United States.

23.     Supplemental jurisdiction over Ms. Kellerman's state law claims is conferred by 28 U.S.C. § 1367.

24.     Venue is proper in this District under 28 U.S.C. § 1391, because the events giving rise to Ms. Kellerman's claims occurred in this District.

## PARTIES

25.     Plaintiff Kerri Kellerman is a 46 year old transgender woman.  She was incarcerated and in the custody of the EOPD from February 5 to on or about February 7, 2016,

and in the custody of the ECDOC from February 7 to February 24, 2016.  At all times relevant to this action, Ms. Kellerman was a resident of the State of New Jersey.

26.    Defendant City of East Orange is a municipality in the State of New Jersey.  It owns, operates, manages, directs, and controls the EOPD, located at 15 South Munn Avenue, East Orange, New Jersey.

27.    Defendant County of Essex is a county in the State of New Jersey.   It owns, operates, manages, directs and controls the ECCF through its Department of Corrections.  The ECCF is located at 354 Doremus Avenue, Newark, New Jersey 07105.

28.    Defendant Alfaro Ortiz is the Director of the ECDOC.  Upon information and belief, he was the Director of the ECDOC during Ms. Kellerman's incarceration in February 2016.  Pursuant to Section 2-75 of the Code of the County of Essex, the ECDOC operates "under the direction and supervision of [its] Director" and is charged with "[o]perat[ing] and maintain[ing] in a safe, sanitary and humane manner the County jail and jail annex as required by federal and state laws, rules and regulations."   In this capacity, Defendant Ortiz was ultimately responsible for the overall management and operation of the ECDOC and for protecting the constitutional rights of all individuals in the custody of the ECDOC.  Additionally, upon information and belief, Ortiz determines rules, regulations, and policy regarding management, personnel, and the overall operation of the ECDOC, including the intake, classification, and housing of transgender inmates.  Ortiz therefore authorizes or condones the unconstitutional policies governing the placement process and the cruel conditions to which transgender inmates are subjected, as described herein.  Ortiz is likewise responsible for the oversight and training and supervision of all ECDOC employees, including its corrections officers.  Therefore, Ortiz directly and proximately has caused the constitutional violations

set forth herein.  At all relevant times, Ortiz was acting under color of state law and within the scope of his employment as an official representative of the ECDOC.  Ortiz is sued in his individual capacity.

29.    Defendant David Boyd is the Deputy Director of the ECDOC.  Upon information and belief, he was the Deputy Director of the ECDOC during Ms. Kellerman's incarceration in February 2016.  In this capacity, Defendant Boyd is jointly responsible with Defendant Ortiz for the overall management and operation of the ECDOC and for protecting the constitutional rights of all individuals in the custody of the ECDOC.  Additionally, upon information and belief, Defendant Boyd determines rules, regulations, and policy regarding management, personnel, and the overall operation of the ECDOC, including the intake, classification, and housing of transgender inmates.  Defendant Boyd therefore authorizes or condones the unconstitutional policies governing the placement process and the cruel conditions transgender inmates are subject to, as described herein.  Defendant Boyd is likewise jointly responsible for the oversight and training and supervision of all ECDOC employees, including corrections officers.  Therefore, Defendant Boyd directly and proximately has caused the constitutional violations set forth herein.  At all relevant times, Defendant Boyd was acting under color of state law and within the scope of his employment as an official representative of the ECDOC.  Defendant Boyd is sued in his individual capacity.

30.    Defendant Charles E. Green was the Warden of ECCF at the time when Ms. Kellerman was incarcerated.  In this capacity, Defendant Green was responsible for all ECCF employees and for protecting the constitutional rights of all individuals detained at ECCF. Additionally, upon information and belief, Defendant Green was responsible for enforcing rules, regulations, and policy affecting pre-trial detainees at ECCF, including the intake,

classification, and housing of transgender inmates. Defendant Green therefore authorized or condoned the unconstitutional policies governing the placement process and the cruel conditions transgender inmates are subject to, as described herein. Defendant Green was likewise responsible for the training and supervision of corrections officers at the ECDOC. Therefore, Defendant Green directly and proximately has caused the constitutional violations set forth herein. At all relevant times, Defendant Green was acting under color of state law and within the scope of his employment as an official representative of the ECDOC. Defendant Green is sued in his individual capacity.

31.    Defendants John and Jane Doe Corrections Officers #1-20 are fictitious names representing unidentified former or current employees of the ECDOC. John and Jane Doe Corrections Officers #1-20 include those ECDOC Corrections Officers who, through their actions or promulgation of policies, had a role in the claims underlying this First Amended Complaint. At all relevant times, these Defendants were acting under color of state law and within the scope of their employment. John and Jane Doe Corrections Officers #1-20 are sued in their individual/personal capacities and remain unknown to Plaintiff at this time.

32.    Defendants John and Jane Doe Police Officers #1-10 are fictitious names representing unidentified current or former employees of the EOPD. John and Jane Doe Police Officers #1-10 include those EOPD Police Officers who, through their actions or promulgation of policies, had a role in the claims underlying this First Amended Complaint. At all relevant times, these Defendants were acting under color of state law and within the scope of their employment. John and Jane Doe Police Officers #1-10 are sued in their individual/personal capacities and remain unknown to Plaintiff at this time.

33.     CFG Health Systems, LLC is a for-profit, physician-owned and operated company that provides medical and behavioral health services in correctional facilities, including the ECDOC.  John and Jane Doe CFG Employees #1-5 are representatives and/or employees of CFG Health Systems who participated in the invasive and unconstitutional cross-gender searches and medical examinations of Ms. Kellerman while she was in ECDOC custody.  At all times relevant to this Complaint, these Defendants were acting under the supervision of CFG and/or ECDOC and under color of state law.

## FACTUAL ALLEGATIONS

**I.     MS. KELLERMAN IS ARRESTED, TAKEN TO EOPD HEADQUARTERS, SEARCHED BY A MALE, HOUSED WITH MEN, RIDICULED AND IGNORED BY EOPD POLICE OFFICERS, AND PLACED IN SOLITARY CONFINEMENT.**

34.     Ms. Kellerman was arrested by the EOPD on February 5, 2016, following an incident with her next door neighbor's relative, whom Ms. Kellerman confronted for loudly yelling and creating a disturbance in the hallway immediately outside her door.[4]

35.     Upon her arrival at EOPD Headquarters, Ms. Kellerman informed the EOPD Police Officers, including, without limitation, John Doe Police Officer #1, that she was legally female and could not be detained with males.

36.     Nevertheless, during the booking and intake process, she was treated as though she was a male arrestee.

37.     Notwithstanding Ms. Kellerman's identification as legally female, John Doe Police Officer #1—a male—stated that he needed to search her person.  Ms. Kellerman objected, reiterating to John Doe Police Officer #1 that she was legally female and did not consent to being

_____

[4] Ms. Kellerman was arrested and charged with a violation of N.J.S.A. 2C:39-5B and N.J.S.A. 2C:12-3A.  The charges against her were dismissed on May 18, 2016, as the Essex County Grand Jury declined to issue a true bill.

searched by a man.  Ms. Kellerman explicitly requested that a female police officer conduct the search.

38.    John Doe Police Officer #1 ignored Ms. Kellerman's requests and conducted a pat-down search on the outside of her clothing, touching the entirety of Ms. Kellerman's body, including intimate body parts.

39.    Ms. Kellerman was then transported to a small holding cell with several male detainees.  She repeatedly asked the EOPD Police Officers to place her in a holding cell for females, but they refused to do so.  Ms. Kellerman was terrified and spent the entire time curled up in a fetal position in the corner of the holding cell.

40.    After approximately one hour, Ms. Kellerman was removed from the holding cell for fingerprinting.  When she spoke to the desk sergeant, John Doe Police Officer #2, she was visibly distressed from the cross-gender search and her time in the male holding cell, as well as from the EOPD's refusal to treat her as a female detainee.  Ms. Kellerman was crying hysterically, hyperventilating, and having difficulty standing.

41.    After she was fingerprinted, John Doe Police Officer #2 placed her in solitary confinement, stating: "At least in here you won't be harassed."  Despite her fragile state, Ms. Kellerman received no hearing or opportunity to object to being placed in solitary confinement.

42.    On February 6, 2016, at approximately 4:45 a.m., Ms. Kellerman was removed from her cell and informed (for the first time) of the charges against her and bail amount that a judge (whom she had never appeared before) had set.  Ms. Kellerman was permitted to place one telephone call before the EOPD Police Officers returned her, once again, to a cell in solitary confinement—without a hearing or any explanations for why she was in isolation.

43.     Ms. Kellerman was suffering in this environment.  She informed multiple John and Jane Doe Police Officers over the course of the day that she was experiencing shortness of breath, felt like her chest was going to explode, and that she was likely having panic attacks.  Ms. Kellerman was ignored by all of them, and no medical personnel ever attended to her.

44.     During this time, John Doe Police Officer #3, a male, approached her cell door and stated:  "When you came in, I thought you were a woman."  He then laughed and walked away.

45.     Ms. Kellerman was transferred to ECCF during the late night/early morning between February 6 and 7, 2016.   Despite her repeated objections, EOPD continued to treat Ms. Kellerman as though she was a male detainee.  She was grouped with and shackled to multiple male detainees while being transported to ECCF.

II.     **MS. KELLERMAN IS DETAINED AT ECCF, HOUSED WITH MEN, THROWN IN SOLITARY CONFINEMENT, AND ASSAULTED.**

    A.     **The ECDOC Corrections Officers ridicule Ms. Kellerman after she advises them that she is a female and, initially, placed her in a female housing unit.**

46.     Upon arrival at ECCF, Ms. Kellerman informed the ECDOC Corrections Officers that she was legally female and could not be searched by males or housed with males.  Ms. Kellerman informed the ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officer #1, that she would be verbally harassed and physically assaulted if she was housed with males.  Her requests continued to fall on deaf ears.

47.     During the booking process at ECCF, Ms. Kellerman was again placed in a holding cell with male detainees.  She remained there for approximately one hour, until she observed one of the EOPD Police Officers who transported her speak to an ECDOC Corrections

Officer.   Ms. Kellerman believes the EOPD Police Officer may have told the ECDOC Corrections Officer what she had been telling everyone all along—that she was female.

48.      After being photographed and issued a plastic wristband containing an "F" on it, she was taken to a female housing unit at ECCF.  Upon information and belief, "F" was a sex designation of "female."

49.      Within minutes of arriving in the female housing area, Jane Doe Corrections Officer #2 asked Ms. Kellerman whether she had "all the surgeries."  Ms. Kellerman assumed that Jane Doe Corrections Officer #2 was asking her if she had sex reassignment surgery involving her genital area.  She responded:  "I am legally female."

**B.      A male physician conducts a cross-gender strip search to determine Ms. Kellerman's biological sex.**

50.      After waiting in a cell in the female housing unit, Jane Doe Corrections Officer #2 took Ms. Kellerman to a small room, in which Ms. Kellerman was subjected to a strip search by CFG Employee #1, a male doctor.  CFG Employee #2, a female nurse, observed the strip search.

51.      This cross-gender strip search was conducted for the sole purpose of determining Ms. Kellerman's biological sex.

52.      During this cross-gender strip search, Ms. Kellerman was instructed to undress from the waist down, and CFG Employee #1 physically fondled and visually inspected her genital anatomy.   Outside of the physical examination of Ms. Kellerman's genitals, CFG Employee #1 performed no further evaluations or examination and did not ask Ms. Kellerman any questions.  Ms. Kellerman was wearing the wristband containing an "F" sex designation throughout this search.

53.      After the initial strip search at ECCF, Jane Doe Corrections Officer #2 took Ms. Kellerman back to the booking area.  At this point, John Doe Corrections Officer #1 approached

Ms. Kellerman and removed her "F" wristband, replacing it with a wristband that had "B" on it. Jane Doe Corrections Officer #2 stated, without elaboration, that "we have to make sure everyone is safe."

    **C.**    **Ms. Kellerman is forced to shower in front of males.**

    54.    After her wristband was changed, Ms. Kellerman was then taken to a room where she was forced to remove her clothes in front of several male inmates and ECDOC Corrections Officers. John Doe Corrections Officer #3, a male, instructed Ms. Kellerman to shower. There were approximately twenty males in the shower room, consisting of a mix of inmates and ECDOC Corrections Officers.

    55.    The shower room contained individual stalls with three sides and a curtain at the front that opened to a desk in the middle of the room. John Doe Corrections Officer #3 left the curtain to Ms. Kellerman's stall open and watched her shower. Ms. Kellerman protested, repeating that she was a female and that John Doe Corrections Officer #3 could not watch her shower.

    56.    Subsequently, John Doe Corrections Officer #3 provided Ms. Kellerman with standard inmate clothing for male detainees and she dressed inside of the stall.

    **D.**    **Ms. Kellerman is brought to the medical unit and strip searched again by another male.**

    57.    Following the shower, Ms. Kellerman met with a female nurse. Ms. Kellerman told the nurse that she was taking Estradiol and Spironolactone.

    58.    Ms. Kellerman was then taken to ECCF's medical unit and placed in an examination room, where she was met by a different male doctor and female nurse, CFG Employees #3 and #4, respectively. The male doctor instructed Ms. Kellerman to undress and physically fondled and visually inspected her genitals. This second ECCF strip search lasted for

- 16 -

significantly longer than the first. The search was conducted for the sole purpose of determining Ms. Kellerman's biological sex.

59.     Beyond fondling her genitals, CFG Employees #3 and #4 performed no other physical examinations. However, in this instance, the male doctor asked Ms. Kellerman questions related to her gender/sex and she explained, once again, that she is legally female and was taking the medications Estradiol and Spironolactone—feminizing hormone therapy used by transgender women. Ms. Kellerman also reiterated that she was afraid to be housed with males.

**E.    Ms. Kellerman is placed in administrative segregation in the medical unit.**

60.     After a short stop at a holding cell, Ms. Kellerman was transferred to a single cell in ECCF's medical unit. At this time, John Doe Corrections Officer #4 advised Ms. Kellerman that she was being placed in medical segregation. She had no hearing prior to her placement in the medical housing area and did not know why she was being placed in this unit.

61.     Ms. Kellerman was placed in medical segregation on February 7, 2016, and remained there for seven days. Medical segregation was, in fact, solitary confinement. Ms. Kellerman was confined to her cell for 23 to 24 hours per day. She had her meals in the cell and no interaction with anyone other than, occasionally, the male Corrections Officers who were observing her during this time. She had no access to other detainees, programming, reading material, or anything that would occupy her mind or give her an opportunity for social interaction.

62.     Ms. Kellerman was only permitted to leave her cell to place short telephone calls. To access the telephone, however, she was forced to enter a male cell block.

63.     On February 12, 2016, Ms. Kellerman was told by CFG Employee #5 that she was being moved the following day to a housing area for "people like you." At that point, Ms.

Kellerman had been in solitary confinement for nine days—almost the entirety of her detention at EOPD and ECDOC.  She still did not know why she had been housed in the medical segregation unit for a week.

64.    Ms. Kellerman was eager to be taken out of isolation, but she did not realize at the time that this meant she was being transferred to the male general population unit.

**F.    Ms. Kellerman is housed in ECCF's male general population unit, where she is verbally harassed and sexually abused.**

65.    Ms. Kellerman's pleas to be housed with females continued to go unanswered. As soon as she realized that she was being escorted to a male general population unit, Ms. Kellerman pleaded with John Doe Corrections Officer #5: "You can't house me with males."  He ignored her cries and instructed her to "keep moving."

66.    In the male general population unit, Ms. Kellerman was assigned to a double occupancy cell.  She was the only occupant at the time.

67.    The male general population unit had an open area, where Ms. Kellerman estimates that as many as 200 male inmates or detainees could walk without restraint.  During Ms. Kellerman's time in the general population unit, the open area was supervised by no more than two ECDOC Corrections Officers at a time.  The Corrections Officers rotated shifts.

68.    In the male general population unit, inmates and detainees could not receive food, shower, or contact ECDOC Corrections Officers without walking through the open area.

69.    The shower area in the male general population unit consisted of single stalls that offered little to no privacy for individuals using the showers—anyone walking by could look in and watch them shower.  To avoid having men watch her shower, and for fear of being raped, Ms. Kellerman did not shower during her time in the general population unit.

70.     While housed in the general population unit, Ms. Kellerman was scared to leave her cell but did so twice so that she could eat.

71.     Two inmates exposed their bare genitals to Ms. Kellerman in a menacing fashion. She felt threatened by them and began having a panic attack. She had been in general population for less than one day and had already been threatened by multiple male detainees. She approached John Doe Corrections Officer #6 and informed him of the sexual harassment she was experiencing; he made eye contact with Ms. Kellerman, but otherwise did not respond.

72.     Fearing for her safety, on February 14, 2016, Ms. Kellerman approached the on-duty ECDOC Corrections Officers, again, including, without limitation, John Doe Corrections Officers #7 and #8, and informed them that she could not be housed in the male general population unit and that she was terrified and suffering from panic attacks. The ECDOC Corrections Officers mocked Ms. Kellerman, asking her if she was "serious" or if she was "making it up."

### G.     Ms. Kellerman is once again transferred to solitary confinement without her knowing consent.

73.     At this point, Ms. Kellerman was instructed to wait in a sally port near the male general population unit. After a few minutes, John Doe Corrections Officer #9, a stocky man with a distinctly large beard, entered the sally port. Upon information and belief, John Doe Corrections Officer #9 held the position of Sergeant.

74.     In the sally port, John Doe Corrections Officer #9 informed Ms. Kellerman that if she wanted to be moved out of general population, she had to sign a form. When Ms. Kellerman attempted to read the form, John Doe Corrections Officer #9 told her that she was "wasting his time" and threatened to leave her in the male general population unit if she did not sign it. He told her: "You'll get a copy. You can read it later." Fearing that she would be stuck in the male

general population unit if she did not sign the form, Ms. Kellerman had no choice but to sign the form without having the opportunity to review its contents. She never received a copy of the form.

75.    After Ms. Kellerman was forced to sign the form, John Doe Corrections Officer #9 began transporting her to a protective custody unit. During the walk to the unit, John Doe Corrections Officer #9 informed Ms. Kellerman that he was taking her to the safest part of the jail for her.

76.    "Protective Custody" was, in effect, solitary confinement. Ms. Kellerman would spend 23 hours per day in her cell. She ate her meals inside her cell and had no opportunity for social interaction with other detainees or staff. No medical staff came to see her, even though she had told the ECDOC Corrections Officers that she had been experiencing panic attacks due to her experience in the male general population unit. Ms. Kellerman had no access to programming, reading material, or outside or inside recreation. She was only permitted to leave her cell for an hour per day to shower and use the phone, but she had to walk through the male protective custody unit to do so and was verbally harassed by the male detainees on the unit any time she left her cell.

77.    At no time did John Doe Corrections Officer # 9 or any other Corrections Officer verbally inform Ms. Kellerman that she was going to be housed in a male housing area with solitary confinement cells. Indeed, Ms. Kellerman believed that she was returning to ECCF's medical unit.

78.    The protective custody unit consisted of two stories: an upper-hallway that was lined on one side with eight single-occupancy cells, and a nearly identical lower-hallway below. Ms. Kellerman was initially housed on the upper-hallway of the unit.

79.     All of the individuals housed in the protective custody unit were males.  The upper-hallway of the unit was separated from the rest of ECCF's male housing area by a gate of metal bars.  An inmate standing at the gate of the upper-hallway could look down at a guard station, where several ECDOC Corrections Officers sat.  Standing up, ECDOC Corrections Officers at the guard station could see the first few cells in the upper-hallway of the unit. ECDOC Corrections Officers could communicate down the hallway by slightly raising their voices, or by using an intercom system.  A video surveillance camera was at the opposite end of the hallway from the gate.

80.     Each cell consisted of three concrete walls and a solid metal door.  The door contained a window that allowed anyone standing outside of Ms. Kellerman's cell to see her, and it also contained a small purportedly key-locked flap where food and medication could be passed to her.  There was a fluorescent light in each cell.  The cell also contained a small combination toilet/sink.

81.     Each cell was equipped with a call button and a two-way intercom system that, if operational, would allow the cell's occupant to communicate with ECDOC Corrections Officers at the guard station.  Ms. Kellerman was never instructed on how to use the intercom system.

82.     Inmates housed on this hallway were only allowed out of their cells, one at a time, for an hour-long "recreation" period.  To signal that it was a specific inmate's recreation period, the ECDOC Corrections Officers would either call down the hall from the guard station or page the inmate over the intercom system, and remotely unlock the inmate's cell from the guard station.  During the recreation period, inmates were able to walk the length of the hallway, use a shower located on the end of the hall, or use the hallway phone.

- 21 -

83.    ECDOC Corrections Officers walked up and down the hallway only sporadically, approximately four to five times per day.  Other than these periodic walks down the hallway, and unless the ECDOC Corrections Officers were looking down the hallway from the guard station or observing the video surveillance camera, the recreation period was virtually unmonitored.

84.    John Doe Corrections Officer #9 took Ms. Kellerman to an unoccupied cell near the end of the upper-hallway of the solitary confinement unit.  As Ms. Kellerman walked past the other cells, inmates began to yell out, menacingly, "Bruce Jenner! Bruce Jenner!"  They immediately recognized her as a vulnerable transgender woman being housed on their unit.  John Doe Corrections Officer #9 and other John Doe Corrections Officers did nothing to discourage or reprimand their behavior.

85.    Ms. Kellerman remained in her cell on the upper-hallway of the unit from February 14 to February 16, 2016.

86.    Throughout the entirety of her two-day stay on the upper-hallway of the solitary confinement unit, Ms. Kellerman was verbally harassed by other detainees and inmates, who yelled threatening and sexual comments to her through their cell walls.  Some of the more aggressive inmates approached her cell door during their "recreation period" and sexually harassed and threatened her while observing her through the door's window.

**H.    Ms. Kellerman is assaulted by another inmate in the solitary confinement unit.**

87.    On February 16, 2016, ECDOC Corrections Officers remotely unlocked the cell of a male inmate ("Assailant") housed in the first cell of the upper-hallway of the solitary confinement unit for Assailant's recreation hour.  Prior to this point, Assailant had verbally harassed Ms. Kellerman during her stay on the upper-hallway of the unit.  He yelled at her from inside his cell, and also made threats to her directly at her cell door during his recreation period.

88.     Once released from his cell, Assailant proceeded to Ms. Kellerman's cell, carrying milk cartons containing human excrement, bodily fluids, and other refuse. Assailant managed to open the slot in Ms. Kellerman's cell door, and began violently throwing human excrement, bodily fluids, and other refuse at Ms. Kellerman. Ms. Kellerman screamed for help, yelling out to the on-duty ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, who were stationed at the guard stand below. Ms. Kellerman also furiously called for help using the intercom system. The Corrections Officers ignored Ms. Kellerman's pleas for help.

89.     Because of the ECDOC Corrections Officers' failure to take any measures to intervene or protect Ms. Kellerman, Assailant managed to continue the assault for the better part of his recreational hour. During that time, Assailant went back to his cell on several occasions to grab additional milk cartons that he had stored in his cell, which were full of human excrement, bodily fluids, and other refuse.

90.     Throughout the remainder of Assailant's recreational hour, Ms. Kellerman continued to scream for help and attempt to contact the on-duty Corrections Officers by pressing the call button of the intercom system. They never came. On information and belief, the Corrections Officers at the guard station, including, without limitation, John Doe Corrections Officers #10, #11, and #12, were able to hear Ms. Kellerman's calls for help—either through the call button and intercom-system or down the hallway—and/or see the assault down the hallway or by way of the video surveillance camera.

91.     Despite the fact that the assault continued for nearly one hour, and despite the fact that the ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, must have heard and/or seen the attack and/or heard Ms. Kellerman's

screams, no Correctional Officer responded, intervened, or otherwise attempted to stop the attack.

92.     Ms. Kellerman was unable to take cover during the assault, and, by the end of the attack, she was covered from head to toe in excrement, bodily fluids, and other refuse.  Ms. Kellerman's cell was left completely uninhabitable.

93.     Before returning to his cell at the end of the one-hour recreation period, Assailant yelled at Ms. Kellerman, "You just got shitted!" or "You got Gassed!"

94.     "Gassing" is prison-slang for the act of "intentionally throwing human excrement or bodily fluids, or a mixture containing them, which results in contact with a person's skin or membranes."[5]  Upon information and belief, "gassing" attacks are common in prisons,[6] including ECCF, and transgender inmates and detainees are particularly at risk for being victims of gassing attacks.

95.     Upon information and belief, the ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, knew that Assailant had a propensity for gassing attacks and other forms of violent or harassing conduct, including through knowledge of his prior acts, criminal and disciplinary records, and through observing threats that he made directly to Ms. Kellerman.

---

[5] *People v. Delgado*, 389 P.3d 805, 834 (Cal. 2017); *see*, *e.g.*, Darwin Bond Graham, *State Auditor to Review 'Gassing' Attacks at Alameda County Jail*, EAST BAY EXPRESS (Mar. 6, 2018), https://www.eastbayexpress.com/SevenDays/archives/2018/03/06/state-auditor-to-review-gassing-attacks-at-alameda-county-jail ("Gassing is prison slang for using feces, urine, bile, and other forms of excrement, as biological projectile weapons. Inmates collect waste matter in bags, trays, or just their hands, and fling it at guards or other detainees.").

[6] *See*, *e.g.*, Graham, *supra* note 4 (noting an increase in gassing attacks over the past several years, requiring staffers to use Plexiglas shields to protect themselves from such attacks, which can result in the transmission of diseases like Hepatitis).

96.     Upon information and belief, the ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, knew that transgender females housed in the male unit, including Ms. Kellerman, were particularly at risk of being assaulted, harassed, and or subjected to unwelcome conduct.

97.     After Assailant returned to his cell, Ms. Kellerman's cell was remotely unlocked so she could take her recreational hour.  Because the entirety of Ms. Kellerman's cell was covered in human excrement, bodily fluids, and refuse, she was unable to use the combination toilet/sink to get clean.

98.     Instead, Ms. Kellerman was forced to face the humiliation of walking down the hallway covered in excrement, bodily fluids, and other refuse, trying not to slip and fall as she proceeded.  During this time, she was ridiculed and harassed by the other inmates on the unit.

99.     Ms. Kellerman proceeded to the gate at the end of the hallway, where she attempted to summon the on-duty ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12.  Upon making contact with the Corrections Officers at the guard station, John Doe Corrections Officer #10 burst out laughing.  Ms. Kellerman asked to speak with their supervisor.

100.     Several minutes later, John Doe Corrections Officer #13, a middle-aged African-American man, approached Ms. Kellerman at the other side of the gated door.  At this time, several of the ECDOC Corrections Officers were still laughing, until John Doe Corrections Officer #13 motioned at them to stop.

101.     Next, one of the Corrections Officers asked Ms. Kellerman why she had not showered.  Ms. Kellerman explained that she could not clean herself in her cell because the entire cell was covered in bodily fluids, human excrement, and other refuse.

102.    During this time, Assailant, who was in the cell closest to the gate, was yelling about the attack and screaming threats that he was going to "fuck her up" if she reported the attack.  Although John Doe Corrections Officer #13 and the other on-duty Corrections Officers must have been able to hear Assailant's additional threats, they never reprimanded Assailant or otherwise took any investigative or disciplinary actions with respect to Assailant during Ms. Kellerman's time in the solitary confinement unit.  Indeed, Ms. Kellerman never saw any of the ECDOC Corrections Officers look into Assailant's cell, let alone confront him about the gassing attack.  Moreover, when Ms. Kellerman told John Doe Corrections Officer #13 that she wanted to press charges against Assailant for prying the flap on her cell open and assaulting her, John Doe Corrections Officer #13 stated that "we don't do that."

103.    Ms. Kellerman was eventually given a new towel and soap and attempted to clean herself in the hallway shower.  Ms. Kellerman was not provided with shampoo or conditioner, however, preventing her from adequately cleaning from her hair all of the bodily fluids, human excrement, and refuse from the gassing attack.

I.    **Ms. Kellerman is transferred to the lower-hallway of the solitary confinement unit, where she is detained for an additional 8 days.**

104.    At the end of her recreation period, Ms. Kellerman refused to return to her waste-covered cell.  Instead, Ms. Kellerman waited by the gate until the ECDOC Corrections Officers finally agreed to take her to a new cell.

105.    Even though the Corrections Officers knew that Ms. Kellerman was legally a female, had been abused in the male general population unit, and had been assaulted in the male-occupied protective custody unit, the Corrections Officers still refused to house Ms. Kellerman in a female unit at ECCF.  Instead, the Corrections Officers merely transferred Ms. Kellerman to

- 26 -

the lower-hallway of the same, male-occupied protective custody unit. The lower-hallway had a similar layout to the upper-hallway.

106.    Ms. Kellerman was housed in this cell for the remainder of her detention at ECCF. While housed in that cell, male inmates continued to verbally harass Ms. Kellerman. Additionally, as Ms. Kellerman walked down the hallway during one of her recreation periods, a male inmate knocked on his cell door to get Ms. Kellerman's attention, exposed his genitals, and began masturbating.

107.    During Ms. Kellerman's detention on the lower-hallway of the solitary confinement unit, she refused to eat as a way of protesting being housed with males. On February 20, 2016, John Doe Corrections Officer #14 approached Ms. Kellerman's cell and threatened to "make her life much worse" if she continued to refuse to eat. Under this coercive atmosphere, Ms. Kellerman agreed to eat but only if John Doe Corrections Officer #14 provided her with a grievance form.

108.    Within a day, Ms. Kellerman returned a completed grievance to John Doe Corrections Officer #14. Ms. Kellerman's grievance form detailed the events of the February 16, 2016 gassing attack. Ms. Kellerman was never questioned regarding the grievance form or the assault, and did not receive a copy of her grievance form or any other response or confirmation that it had been considered or even submitted to the proper authorities.

109.    Ms. Kellerman had a right to be free from assault at all times during her detainment at ECCF, including from the gassing attack on February 16, 2016.

110.    The ECDOC Corrections Officers who were on duty at the guard station, including, without limitation, John Doe Defendants #10, 11, and 12, had a duty to prevent, stop, and effectively intervene during the gassing attack.

111.    Despite having a reasonable opportunity to do so, the Corrections Officers who were on duty at the guard station, including, without limitation, John Doe Defendants # 10, 11, and 12, failed to prevent, stop, and/or effectively intervene during the gassing attack.

112.    Ms. Kellerman was never informed that she was going to be transferred to protective custody and would therefore spend her days in solitary confinement.

113.    Ms. Kellerman was never informed of why she was placed in solitary confinement.

114.    Ms. Kellerman was never provided with a hearing before or after her placement in solitary confinement.

115.    Ms. Kellerman was never given an opportunity to respond in writing to her placement in solitary confinement.

116.    Ms. Kellerman's family paid her bond and she was released from Essex County Jail on February 24, 2016.

**III.    POLICY AND PRACTICE ALLEGATIONS**

117.    The increased rate of discrimination, violence, and sexual abuse experienced by transgender women housed in male correctional facilities is well documented.[7]  In recognition of

---

[7] According to a 2014 report issued by U.S. Department of Justice's Bureau of Justice Statics, almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general. *See* U.S. Dep't of Justice, Bureau of Justice Statics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12, Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* (December 2014), https//www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf; *see also* Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault*, IRVINE: CENTER FOR EVIDENCE-BASED CORRECTIONS, UNIVERSITY OF CALIFORNIA                                    30                                    (2007), http://ucicorrections.seweb.uci.edu/files/2013/06/PREA_Presentation_PREA_Report_UCI_Jenn ess_et_al.pdf (59% of transgender women housed in men's prisons reported being sexually assaulted); The Editorial Board, *Prisons and Jails Put Transgender Inmates at Risk*, N.Y. TIMES, Nov. 9, 2015, https://www.nytimes.com/2015/11/09/opinion/prisons-and-jails-put-transgender-inmates-at-risk.html ("Transgender inmates who are assaulted or harassed are often placed in solitary

the systemic failure to protect transgender inmates and detainees from abuse, the U.S. Department of Justice has issued public statements and promulgated rules and regulations for containment facilities that ban cross-gender searches; incorporate the unique vulnerabilities of transgender inmates into training and screening protocols; enable inmates to shower, perform bodily functions, and change clothing without improper viewing by inmates and staff of the opposite gender; and restrict the use of solitary confinement as a means of protecting vulnerable inmates.[8]  Defendants, acting in concert, deprived Ms. Kellerman of the fundamental human rights and dignities protected by these rules and regulations.

118.    Under the policies, practices, and/or customs of EOPD and ECDOC, housing units are sex-segregated and detainees are categorized as either "male" or "female" based on their external genital characteristics or assigned sex at birth, regardless of their gender identity, presentation, or their legal status.  Upon information and belief, EOPD and ECDOC do not have a system for classifying and tracking transgender, intersex, and gender non-conforming inmates, and do not take into account gender identity, expression, presentation, or legal status when placing inmates in "male" or "female" housing areas.  Upon information and belief, it is the policy, practice, and/or custom at EOPD and ECDOC to house transgender women in male housing units.

---

confinement, which, though intended for their protection, is in fact a severe punishment. Isolation takes an enormous psychological toll on inmates, and can put them at increased risk of assault by guards. It deprives them of access to group therapy and educational programs that could improve employment prospects upon release.").

[8] *See* U.S. Dep't of Justice, Office of Public Affairs, *Justice Department Releases Final Rule to Prevent, Detect and Respond to Prison Rape* (May 17, 2012), https://www.justice.gov/opa/pr/justice-department-releases-final-rule-prevent-detect-and-respond-prison-rape.

119.    This strict genitalia-driven approach to classification and attendant housing assignments means that transgender women, like Ms. Kellerman, are forced to shower, sleep, and live among male inmates and detainees.

120.    The classification and housing policies of EOPD and ECDOC fail to comply with PREA, which applies to these entities under 34 U.S.C. § 30309(7).[9]  PREA contains several protections for transgender inmates and detainees, designed to ensure that these vulnerable members of society are provided with the appropriate classification and housing and are protected from violence at the hands of correctional officers and other inmates and detainees. More specifically, PREA provides:

- Prisons and jails must screen prisoners within 72 hours of intake to assess their risk for sexual victimization or abuse.  *See* 28 C.F.R. §§ 115.41(b), 115.241(b), 115.341(a).  Such screening must take into account whether the prisoner is (or is perceived to be) lesbian, gay, bisexual, transgender ("LGBT") or gender nonconforming, and facilities must consider this screening information in making housing and program assignments, with the goal of protecting vulnerable prisoners. *See* 28 C.F.R. § 115.41(c)(7).

- Transgender and intersex inmates must have the opportunity to shower separately from other inmates.  *See* 28 C.F.R. § 115.42(f).

- Gender non-conforming inmates should not be housed in a dedicated unit or facility solely on the basis of that identification.  *See* 28 C.F.R. § 115.42(g).

- Housing decisions for transgender or intersex inmates—in a male or female facility as well as housing within the facility—should be made on a case-by case basis considering the inmate's health and safety.  *See* 28 C.F.R. §§ 115.42(b)-(c).

- Transgender or intersex inmates should not be searched for the sole purpose of determining genitalia.  *See* 28 C.F.R. § 115.15(e).

- Prisons and jails are not permitted to place detainees in administrative segregation against their will unless they have found—within the first 24 hours of involuntary segregation—that there is no other way to keep the prisoner safe.  *See* 28 C.F.R. § 115.43(a).

---

[9] 34 U.S.C. § 30309 was formerly cited as 42 U.S.C. § 15609.

121.    According to the National PREA Resource Center, being transgender is a known risk factor for being victimized in prison.

> The [PREA] standard, therefore, requires that facility, housing, and programming assignments be made 'on a case-by-case basis.' Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard. A PREA-compliant policy must require an individualized assessment. A policy must give 'serious consideration' to transgender or intersex inmates' own views with respect to safety. The assessment, therefore, must consider the transgender or intersex inmate's gender identity – that is, if the inmate self-identifies as either male or female. A policy may also consider an inmate's security threat level, criminal and disciplinary history, current gender expression, medical and mental health information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The policy will likely consider facility-specific factors as well, including inmate populations, staffing patterns, and physical layouts. The policy must allow for housing by gender identity when appropriate.

*Does a policy that houses transgender or intersex inmates based exclusively on external genital anatomy violate Standard 115.42(c) & (e)?* NATIONAL PREA RESOURCE CENTER (March 24, 2016), https://www.prearesourcecenter.org/node/3927.

122.    The policies, practices, and/or customs enacted and/or implemented by Defendants City of East Orange at EOPD Headquarters and by County of Essex at Essex County Jail fail to comply with these federal regulations. While these Defendants may have enacted certain written policies that purport to comply with PREA, in practice, they do not. Their *de facto* policies, practices, and customs include, *inter alia*:

> A.    Housing transgender inmates and detainees according to their external genital anatomy, rather than making an individualized assessment as PREA requires;
>
> B.    Improperly housing transgender female inmates and detainees in male containment cells or male general population units at EOPD Headquarters and ECCF;

C.     Permitting cross-gender pat-down and strip searches on transgender inmates and detainees;

D.     Permitting strip searches and medical examinations on transgender inmates and detainees for the sole purpose of determining their external genital anatomy;

E.     Failing to have in place a reasonable alternative to solitary confinement for transgender female inmates and detainees who cannot be safely housed in male general population units;

F.     Failing to properly train EOPD and ECDOC employees on how to care for and interact with transgender inmates and detainees;

G.     Condoning a culture of harassment and abuse of transgender detainees and inmates; and

H.     Failing to adequately investigate complaints by transgender inmates and detainees related to allegations concerning abuse and harassment.

123.    All policies, practices, and customs concerning the treatment of transgender inmates and detainees at Essex County Jail were promulgated, issued, authorized, and/or implemented by Defendants Ortiz, Boyd, and Green.   These Defendants are likewise responsible for issuing and authorizing ECDOC's written policies on Classification, Inmate Intake, Special Housing Units, Protective Custody, and Sexual Abuse and Assault Prevention and Intervention, and are therefore responsible for the failure of these policies as written or applied to comply with PREA.

124.    The above policies, practices, and customs result in transgender women, like Ms. Kellerman, being housed in all-male containment cells or general population units where they are at risk for sexual victimization or abuse.

125.    Defendants are well aware of the substantial risk of harm that transgender inmates face and that PREA seeks to prevent, from the increased rates of violence that are widely-known in the corrections field and from the culture and environment at EOPD and Essex County Jail.

126.    Upon knowledge and belief, Ms. Kellerman is not the first transgender inmate at Essex County Jail to have experienced abuse and discrimination while incarcerated, and to have filed a grievance regarding unlawful conditions of confinement.  The substantial risk of harm to transgender inmates was exacerbated by Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green's deliberate indifference and failure to train the Defendant Officers on how to treat transgender inmates humanely and how to protect them from harm.

127.    The failure to train and resulting increased risk of harm is evident from almost every interaction that Ms. Kellerman had with the Defendant Officers, including, without limitation, the following:

A.    John Doe Police Officer #1, whom Ms. Kellerman had told she was "legally female," refused her request to be searched by a female police officer, and proceeded to conduct a pat-down search that involved touching her genital area outside her clothing.  Ms. Kellerman was then placed in a holding cell with males.

B.    John Doe Police Officer #2 observed that Ms. Kellerman was crying hysterically, hyperventilating, and having difficulty standing after spending an hour in EOPD's holding cell for males.  He responded by placing her in solitary confinement, stating: "At least in here you won't be harassed."

C.    John Doe Police Officer #3 approached her cell door and stated:  "When you came in, I thought you were a woman."  He then laughed and walked away.

D.    Ms. Kellerman informed multiple John and Jane Doe Police Officers that she was experiencing shortness of breath, felt like her chest was going to explode, and that she was likely having panic attacks.  She was ignored by all of them.  No medical personnel ever came to visit her while she was in solitary confinement.

E.    The John Doe Police Officers shackled her to multiple male detainees while transporting her to Essex County Jail.

F.    Jane Doe Corrections Officer #2 asked Ms. Kellerman whether she had "all the surgeries" and took her to a small room where CFG Employees #1

and 2 performed a cross-gender strip search for the sole purpose of determining Ms. Kellerman's biological sex.

G.    John Doe Corrections Officer #3 instructed Ms. Kellerman to remove her clothes and shower in a room with approximately twenty males; he then left the curtain to Ms. Kellerman's stall open and watched her shower.

H.    Ms. Kellerman was subjected to a second humiliating and invasive cross-gender strip by CFG Employees #3 and 4, during which the male doctor fondled her genitalia for a lengthy period.

I.    After spending 7 days in solitary confinement while in the medical unit, CFG Employee #5 told Ms. Kellerman she was being moved to a housing area for "people like you."

J.    In the general population unit, two inmates exposed their bare genitals to Ms. Kellerman in a menacing fashion. John Doe Corrections Officer #6 had no response when she told him of the incidents. Fearing for her safety, Ms. Kellerman approached the guard station again, and John Doe Corrections Officers #7 and #8 mocked her and asked if she was "serious" or if she was "making it up."

K.    John Doe Corrections Officer #9 told Ms. Kellerman that she had to sign a form if she wanted to be moved out of the male general population unit. He did not give her time to read the form or explain that she was being moved to a solitary confinement cell in the male-occupied protective custody unit.

L.    The John Doe Corrections Officers responsible for monitoring the protective custody unit said nothing to discourage the male detainees and inmates from making lewd remarks and threatening gestures at Ms. Kellerman and referring to her as "Bruce Jenner." John Doe Corrections Officers #10, #11, and #12 then failed to intervene while she was being assaulted by another inmate and ignored her pleas for help. They then laughed at her when she appeared before them covered in human waste.

M.    John Doe Corrections Officers #10, 11, 12, and 13 heard Assailant screaming threats at Ms. Kellerman after the attack, including that he was going to "fuck her up," and they did nothing to stop or reprimand him for the threats or the attack.

N.    Ms. Kellerman was returned to another solitary confinement cell in the male protective custody unit. John Doe Corrections Officer #14 threatened to "make her life much worse" if she continued to refuse to eat.

        O.    Ms. Kellerman submitted a grievance through John Doe Corrections Officer #14 regarding the February 16, 2016 attack, but she never heard anything in response.

128.    As the above interactions illustrate, Ms. Kellerman's mistreatment at EOPD and Essex County Jail was not the result of one bad actor's failure to comply with EOPD and ECDOC policies. Rather, there is a pervasive culture of harassment and abuse towards transgender detainees and inmates that is condoned and perpetuated by the deliberate indifference of EOPD and ECDOC employees.

129.    Because Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Greene's policies, practices, and/or customs often lead to a substantial risk of harm for transgender inmates, they rely on the use of involuntary segregation (which is harmful in and of itself) as a safety measure, foregoing other alternatives that would allow transgender inmates to remain safe in a humane environment.

130.    Outside of housing transgender women in the male general population unit or in some form of administrative segregation or close custody that amounts to solitary confinement, there exists no reasonable alternative placement options in EOPD or Essex County Jail for transgender women.

131.    Moreover, under these Defendants' policies, practices, and/or customs, transgender inmates are routinely subject to invasive and unlawful bodily searches, and are not afforded the privacy to which they are legally entitled when removing clothing or showering.

## CAUSES OF ACTION

## COUNT ONE

### UNREASONABLE SEARCHES

**(Against Defendants City of East Orange, County of Essex, Ortiz, Boyd, Green, John and Jane Doe CFG Employees #1 - #4, and John Doe Police Officer #1)**

132.    Ms. Kellerman repeats, realleges, and incorporates by reference the preceding paragraphs of her First Amended Complaint as though fully set forth herein.

133.    Count One is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment of the U.S. Constitution.

134.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

135.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . . ."  U.S. CONST. amend. IV.

136.    Defendant John Doe Police Officer #1 is liable for conducting an unreasonable and unconstitutional cross-gender pat-down search of Ms. Kellerman at the EOPD headquarters on February 5, 2016.   John Doe Police Officer #1 knowingly proceeded with the cross-gender search of a transgender female detainee.

137.    Defendants CFG Employees #1 and #2 are liable for conducting an unreasonable and unconstitutional cross-gender strip search of Ms. Kellerman, whom they knew to be a transgender woman, at Essex County Jail on February 7, 2016.

138.    Defendants CFG Employees #3 and #4 are liable for conducting a second unreasonable and unconstitutional cross-gender strip search of Ms. Kellerman, whom they knew to be a transgender woman, at Essex County Jail on February 7, 2016**.**

139.    Defendant City of East Orange is liable for creating and/or maintaining a policy, practice, and/or custom of having male police officers conduct pat-down searches of female transgender detainees.  Such policy, practice, and/or custom caused the unconstitutional cross-gender search of Ms. Kellerman at EOPD.

140.    Defendant County of Essex is liable for creating and/or maintaining a policy, practice, and/or custom of having male corrections officers or medical personnel conduct strip searches of female transgender detainees.  The searches are highly invasive and involve fondling the detainees' genital area.  Such policy, practice, and/or custom caused the unconstitutional strip searches of Ms. Kellerman at Essex County Jail.

141.    Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the strip search policies and practices at ECDOC, pursuant to which Ms. Kellerman was subject repeatedly to an unconstitutional and cross-gender strip search.

142.    None of the strip searches conducted in this matter were authorized by warrant or consent.

143.    None of the strip searches conducted in this matter were based on probable cause or reasonable suspicion that a weapon, controlled dangerous substance, contraband or evidence of a crime would be found.

144.    No recognized exception to the warrant requirement existed in this matter.

145.    Ms. Kellerman was searched for the sole purpose of determining her biological sex through an examination of her genital anatomy.

146.    All searches conducted in this matter were performed by persons of the opposite sex and in a location where the search was observed by persons not physically conducting the search.

147.    The Defendants' aforesaid conduct violated Ms. Kellerman's right to be free from unreasonable searches under the Fourth Amendment of the U.S. Constitution; PREA, 28 C.F.R. § 115.15(e); her right not to be subjected to strip searches unless specifically permitted by law, pursuant to N.J.S.A. 2A:161A-1; and her right to have any lawful strip search conducted by a person of the same sex, pursuant to N.J.S.A. 2A:161A-4.

148.    Defendants' unconstitutional searches caused Ms. Kellerman great discomfort, humiliation, and psychological harm.

## COUNT TWO

### FAILURE TO PROTECT

**(Against Defendants County of Essex, Ortiz, Boyd, Green, and John Doe Corrections Officers #1-20)**

149.    Ms. Kellerman repeats, realleges, and incorporates by reference the preceding paragraphs of her First Amended Complaint as though fully set forth herein.

150.    Count Two is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

151.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

152.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.

153.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees may not be punished prior to an adjudication of guilt.

154.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to safe and humane conditions of confinement.

155.  At the time of Ms. Kellerman's detention, Ms. Kellerman had not been convicted of a crime, and thus, Ms. Kellerman had a constitutional right to be free from punishment and to safe and humane conditions of confinement.

156.  Defendants County of Essex, Ortiz, Boyd, Green, and John Doe Corrections Officers #1-20 had a constitutional obligation to protect Ms. Kellerman from being assaulted by other inmates and detainees at Essex County Jail, and Ms. Kellerman had a constitutional right to be protected from assaults by other inmates and detainees.

157.  Ms. Kellerman was housed under conditions posing a substantial risk of harm, including, but not limited to:

     A.    Being housed as a transgender woman with males;

     B.    Being housed as a transgender woman with males with a history of violence;

     C.    Being housed in a solitary confinement unit where inmates and detainees were unmonitored during their recreation periods, with access to Ms. Kellerman's cell; and

     D.    Being housed in a solitary confinement unit where she had previously been threatened with violence.

158.  These Defendants knew and/or were aware that housing Ms. Kellerman, a transgender woman who identified, expressed, and presented herself as female, with male inmates/detainees, including male inmates/detainees with a history of violence, placed Ms. Kellerman at a substantial risk of harm.

159.  It is well-known and widely accepted in the corrections profession and industry that transgender inmates experience higher rates of discrimination, sexual abuse, and harassment than other inmates and detainees.  Upon information and belief, Defendants are also aware that other transgender inmates housed in Essex County Jail have submitted grievances about their

conditions of confinement, and are therefore on notice of the hostile and dangerous environment ECCF presents for this vulnerable population.

160. Moreover, Ms. Kellerman herself repeatedly warned the John Doe Corrections Officers that she could not be housed with males, and that she would be physically harmed if she was housed with males. They also observed other inmates and detainees harass and threaten Ms. Kellerman with violence while she was in custody.

161. Despite their knowledge of the substantial risk of serious harm faced by Ms. Kellerman in being housed with males, John Doe Corrections Officers failed to transfer Ms. Kellerman from the male unit and/or take any other reasonable measures to protect Ms. Kellerman from harm or abate the risk of harm, to an extent that shocks the conscience.

162. The John Doe Corrections Officers intentionally and/or recklessly failed to prevent, stop, or effectively intervene in the February 16, 2016 gassing attack, and thereby acted with intent to harm Ms. Kellerman, deliberate indifference to Ms. Kellerman's health and safety, and/or with reckless disregard of the substantial risk of serious harm to Ms. Kellerman, to an extent that shocks the conscience.

163. As a result of the John Doe Corrections Officers' conduct, Ms. Kellerman was brutally assaulted by Assailant on February 16, 2016.

164. The John Doe Corrections Officers' aforesaid conduct in exposing Ms. Kellerman to a substantial risk of serious harm, and acting with intent to harm Ms. Kellerman, deliberate indifference to Ms. Kellerman's health and safety, and/or with reckless disregard of the substantial risk of serious harm to Ms. Kellerman, resulted in Ms. Kellerman being physically assaulted and violated Ms. Kellerman's due process rights under the Fourteenth Amendment of the U.S. Constitution.

165. At all times material to this First Amended Complaint, the County of Essex maintained polices, practices, and customs, described below and above, which were ratified by policymakers for ECDOC with final policymaking authority, and which policies, practices, and customs were the driving force behind the constitutional violations outlined in Count Two of this First Amended Complaint.  These policies, practices, and customs included, *inter alia*:

A.      ECDOC's policy, practice, and/or custom of housing transgender inmates/detainees according to their external genital anatomy, rather than making an individualized assessment as PREA requires;

B.      ECDOC's policy, practice, and/or custom of improperly housing transgender women in the general population and/or solitary confinement portion of the male housing unit of ECCF, instead of with female inmates/detainees or in a separate unit designed to adequately house and protect transgender inmates/detainees;

C.      ECDOC's policy, practice, and/or custom of failing to have in place a reasonable alternative to solitary confinement for transgender female inmates/detainees who cannot be safely housed in male general population units;

D.      ECDOC's policy, practice, and/or custom of failing to properly train ECDOC employees on how to care for and interact with transgender inmates and detainees;

E.      ECDOC's policy, practice, and/or custom of condoning a culture of harassment and abuse of transgender detainees and inmates in ECCF; and

F.      ECDOC's policy, practice, and/or custom of failing to adequately investigate complaints by transgender inmates related to allegations concerning abuse and harassment.

166. Alternatively, the County of Essex failed to have in place adequate and constitutionally mandated policies to protect the constitutional rights of Ms. Kellerman, which omission proximately and directly caused the constitutional violations set forth in Count Two of this First Amended Complaint.

167. Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the above policies, which proximately and directly caused the constitutional violations set forth in Count Two of this First Amended Complaint.

168. Moreover, Defendants Ortiz, Boyd, and Green's failure to train the John Doe Corrections Officers to fulfill their constitutional duties to protect Ms. Kellerman and other transgender inmates from harm, proximately and directly caused the constitutional violations set forth in Count Two of this First Amended Complaint.

169. As a result of the Defendants' conduct, Ms. Kellerman suffered sexual abuse and harassment and an assault that resulted in irreparable psychological harm, including severe and lasting emotional distress, humiliation, anxiety, past and future mental anguish, past and future pain and suffering, and aggravation of preexisting injuries. The Defendants' conduct has contributed to and/or resulted in diagnoses of depression, anxiety, Post-Traumatic Stress Disorder, and Agoraphobia.

## COUNT THREE

### FAILURE TO INTERVENE

### (Against Defendants John Doe Corrections Officers #10, #11, #12)

170. Ms. Kellerman repeats, realleges, and incorporates by reference the preceding paragraphs of her First Amended Complaint as though fully set forth herein.

171. Count Three is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

172. John Doe Corrections Officers are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

173.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.

174.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees may not be punished prior to an adjudication of guilt in accordance with due process of law.

175.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to safe and humane conditions of confinement.

176.    At the time of Ms. Kellerman's detention, she had not been convicted of a crime, and thus, Ms. Kellerman had a constitutional right to be free from punishment and to be detained in safe and humane conditions of confinement.

177.    The ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, had a constitutional obligation to protect Ms. Kellerman from being assaulted by other inmates and detainees at Essex County Jail, and Ms. Kellerman had a constitutional right to be protected from assaults by other inmates and detainees.  This constitutional duty included a duty to prevent, stop, and/or intervene in the case of an assault of Ms. Kellerman by another inmate or detainee.

178.    Among other reasons, the ECDOC Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, were aware that the gassing attack was occurring and had a reasonable opportunity to prevent, stop, or effectively intervene in the gassing attack because, upon information and belief:

> A.    The Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, could see the gassing attack via the live footage shown from the surveillance camera that was broadcasted at their station;

B.    The Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, could see the gassing attack occur from the guard station, particularly since Assailant emerged from the last cell on the end of the hallway closest to the guard station;

C.    The Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, heard Ms. Kellerman's screams and calls for help from the guard station;

D.    The Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, heard Ms. Kellerman's pleas for help through the intercom system; and

E.    The gassing attack occurred over the better part of one-hour, providing ample time for the Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, to prevent, stop, or intervene in the gassing attack.

179.    Despite the reasonable opportunity to prevent, stop, or effectively intervene in the gassing attack, the Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, failed to take any action to prevent, stop, or effectively intervene in the attack.

180.    The failure of the Corrections Officers, including, without limitation, John Doe Corrections Officers #10, #11, and #12, to intervene over the course of the one-hour gassing attack was unreasonable, and amounted to a violation of Ms. Kellerman's constitutional right to safe conditions of confinement.

181.    As a result of the Defendants' conduct, Ms. Kellerman suffered sexual abuse and harassment and an assault that resulted in irreparable psychological harm, including severe and lasting emotional distress, humiliation, anxiety, past and future mental anguish, past and future pain and suffering, and aggravation of preexisting injuries. The Defendants' conduct has contributed to and/or resulted in diagnoses of depression, anxiety, Post-Traumatic Stress Disorder, and Agoraphobia.

## COUNT FOUR

### PROCEDURAL DUE PROCESS VIOLATION
### FOR SOLITARY CONFINEMENT

**(Against City of East Orange, County of Essex, Ortiz, Boyd, Green, John Doe Police Officers, and John Doe Corrections Officers)**

182.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

183.    Count Four is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

184.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

185.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

186.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees may not be punished prior to an adjudication of guilt.

187.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to humane conditions of confinement.

188.    At the time of Ms. Kellerman's detention, Ms. Kellerman had not been convicted of a crime, and thus, Ms. Kellerman had a constitutional right to be free from punishment and to humane conditions of confinement. Specifically, Ms. Kellerman had a protected liberty interest in not being housed in conditions that amount to solitary confinement at EOPD and Essex County Jail.

- 45 -

189.     Other than the approximate one hour she spent in the male containment cell at EOPD, Ms. Kellerman was placed in solitary confinement for the entirety of her detention at EOPD.  Similarly, Ms. Kellerman spent less than 24 hours in the male general population unit at Essex County Jail, and was placed in solitary confinement for the remainder of her 18-day detention at ECCF.

190.     Ms. Kellerman's placements in solitary confinement constitute an atypical and significant hardship as compared with the ordinary incidents of a female in pretrial detention for at least the following reasons:  (1) she was in almost complete isolation; (2) the indefinite nature of the confinement; and (3) her inability to challenge the placement in solitary confinement.

191.     The conditions in solitary confinement were unjustifiably severe.  Ms. Kellerman was forced to live in isolation in small cells for typically more than 23 hours a day, 7 days a week.  She had no ability to exercise and was denied meaningful human interaction and mental stimulation.  She had no access to programming or mental health and rehabilitative services that are the ordinary incidents of prison life for inmates/detainees in the general population.  Despite informing John Doe Police Officers and John Doe Corrections Officers that she was experiencing panic attacks and other symptoms of physical and mental anguish while in solitary confinement, including refusing to eat, no medical professionals ever checked in on her.

192.     Ms. Kellerman was only released from solitary confinement at EOPD when she was transferred to Essex County Jail, where, within hours of arriving, she was once again placed in isolation.  Ms. Kellerman was only released from solitary confinement at Essex County Jail because her family had posted bond for her and she was being released from the facility.  Thus, Ms. Kellerman's release from solitary confinement was not predicated upon any acts or policies of Defendants.   External factors were responsible for her release from this inhumane

environment.  But for her ability to post bond, Ms. Kellerman would have remained in solitary confinement indefinitely and for the duration of her incarceration.  Upon information and belief, detainees/inmates at Essex County Jail can spend months, possibly even years, on a close custody status that amounts to solitary confinement.

193.    Ms. Kellerman was placed in isolation without justification and without being afforded any meaningful opportunity to challenge her placements.  By denying Ms. Kellerman any meaningful review of her placements in solitary confinement, Defendants deprived her of liberty without due process of law, in violation of the Fourteenth Amendment.

194.    Ms. Kellerman never had notice or a hearing prior to or during her placement in solitary confinement.

195.    Ms. Kellerman was not provided with an explanation or the reason for her repeated placement in solitary confinement, or an opportunity to respond.

196.    Ms. Kellerman never provided knowing and voluntary consent to being placed in conditions that amount to solitary confinement.

197.    Prior to Ms. Kellerman's placement in protective custody on February 14, 2016, she did sign a form that was provided to her by John Doe Corrections Officer #9.  However, Ms. Kellerman did not know the contents of this form, because she was never provided with an adequate opportunity to review it prior to signing, nor was she provided with a copy.  That form was executed under threats, coercion, and duress.

198.    Defendants also violated ECDOC's policies regarding placements on a close custody status.  Pursuant to the policy of ECCF, the Classification Unit/SHU Supervisor is required to "review involuntary protective custody placements within seven (7) days."

- 47 -

Additionally, "[a]t the involuntary protective custody review the inmate/ICE Detainee shall be given the opportunity to appear personally before the classification unit."

199.    Ms. Kellerman's placement in protective custody was involuntary.

200.    Upon information and belief, contrary to the aforementioned policy, the Classification Unit/SHU Supervisor never reviewed Ms. Kellerman's involuntary placement in protective custody.  In the event such a review did occur, Ms. Kellerman was never given the opportunity to appear before the classification unit.

201.    Moreover, where an inmate/ICE Detainee disagrees with the decision of the Classification Unit/SHU Supervisor, the inmate "may make their final appeal to the Office of the Warden or his/her designee."  Ms. Kellerman was never provided with the opportunity to appeal her classification.

202.    At all times material to this First Amended Complaint, the City of East Orange and County of Essex maintained polices, practices, and customs, described below and above, which were ratified by policymakers with final policymaking authority, and which policies, practices, and customs were the driving force behind the constitutional violation outlined in Count Four of this First Amended Complaint.  These policies, practices, and customs included, *inter alia*:

   A. EOPD's and ECDOC's policy, practice, and/or custom of improperly housing transgender female prisoners in conditions that amount to solitary confinement, instead of with female inmates/detainees or in a separate unit designed to adequately house and protect transgender inmates/detainees;

   B. EOPD's and ECDOC's policy, practice, and/or custom of failing to have in place a reasonable alternative to solitary confinement for the housing of transgender female inmates/detainees;

   C. EOPD's and ECDOC's policy, practice, and/or custom of failing to properly train their employees on how to care for and interact with transgender inmates/detainees; and

- 48 -

D.       EOPD's and ECDOC's policy of refusing to provide transgender inmates/detainees placed in solitary confinement with notice of their placement or an opportunity to respond or contest their transfer into solitary confinement, either through a formal hearing process or informally.

203.     Alternatively, City of East Orange and County of Essex failed to have in place adequate and constitutionally mandated policies to protect the constitutional rights of Ms. Kellerman, which omissions proximately and directly caused the constitutional violation set forth in Count Four of this First Amended Complaint.

204.     Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the above *de facto* policies, which proximately and directly caused the constitutional violations set forth in Count Four of this First Amended Complaint.

205.     Defendants John Doe Police Officers and John Doe Corrections Officers who participated in the placement of Ms. Kellerman in conditions that amount to solitary confinement violated her due process rights by forcing her to live in conditions that impose atypical and significant hardship without procedural protections.

206.     As a direct and proximate result of Defendants' constitutional violations, Ms. Kellerman suffered serious psychological harm, including severe and lasting emotional distress, humiliation, anxiety, past and future mental anguish, past and future pain and suffering, and aggravation of preexisting injuries. The Defendants' conduct has contributed to and/or resulted in diagnoses of depression, anxiety, Post-Traumatic Stress Disorder, and Agoraphobia.

## COUNT FIVE

### CONDITIONS OF CONFINEMENT CLAIM
### FOR SOLITARY CONFINEMENT

**(Against City of East Orange, County of Essex, Ortiz, Boyd, Green, John Doe Police Officers, and John Doe Corrections Officers)**

207.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the precedent paragraphs of this First Amended Complaint, as though fully set forth herein.

208.    Count Five is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

209.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

210.    The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.

211.    Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees may not be punished prior to an adjudication of guilt.  Pretrial detainees have a constitutional right to humane conditions of confinement.  Solitary confinement in a containment facility is a form of punishment subject to scrutiny under the Fourteenth Amendment.

212.    At the time of Ms. Kellerman's detention, she had not been convicted of a crime, and thus, Ms. Kellerman had a constitutional right to be free from punishment and to humane conditions of confinement.  Specifically, Ms. Kellerman had a protected liberty interest in not being housed in solitary confinement at EOPD and Essex County Jail.

213.    Defendants' policy and practice of placing transgender female pretrial detainees in solitary confinement deprived Ms. Kellerman of basic human needs, subjecting her to a substantial risk of serious harm. This practice violated Ms. Kellerman's human dignity and constitutional right to be free from punishment under the Fourteenth Amendment.

214.     The physical and psychological consequences of solitary confinement constitutes a severe deprivation of fundamental human needs, including but not limited to human interaction, environmental stimulation, sleep, and adequate physical exercise.  This extensive deprivation of basic human needs caused intense psychological anguish and resulted in lasting psychological harm to Ms. Kellerman.

215.     Defendants' policy of placing transgender female pretrial detainees in solitary confinement inflicted punishment on Ms. Kellerman.  Placement in medical segregation or protective custody is intended to be for non-punitive purposes.  Protective custody should be used to protect inmates, not cause them more harm.  But instead of fulfilling their obligation to protect transgender pretrial detainees in their care, Defendants punished them for their vulnerable states and the threats that others made *against them*.

216.     Housing vulnerable inmates/detainees in cruel conditions simply because they need protection serves no valid, lawful purpose.  Defendants can find a way to protect transgender female pretrial detainees, like Ms. Kellerman, in the least restrictive setting necessary to ensure their safety.  It is no mystery how to do this.  The Federal Bureau of Prisons has provided a roadmap with their "Reintegration Housing Units," as have other states that have drastically reduced their reliance on solitary confinement to protect vulnerable populations.

217.     Moreover, Defendants were not able to protect Ms. Kellerman from the February 16, 2016 attack she endured, even while in protective custody.  They therefore cannot claim that this custody status, and the resulting placement in solitary confinement, had any legitimate non-punitive purpose.

218.     The policies and practices that led to Ms. Kellerman spending almost the entirety of her time in detention in solitary confinement were implemented by Defendants with deliberate indifference to the substantial risk of serious harm created by those policies.

219.     Upon information and belief, the mental anguish and suffering arising out of the conditions in which Ms. Kellerman was confined, and the long-term effects of those conditions, are known to Defendants.  The literature on solitary confinement is extensive and unanimous in its conclusions on the harms of solitary confinement.  Defendants have been on notice and continue to be on notice of all of the deprivations stated above.

220.     Nevertheless, John Doe Police Officers and John Doe Corrections Officers knowingly and intentionally placed Ms. Kellerman in solitary confinement absent any permissible or legitimate non-punitive objective.

221.     By placing Ms. Kellerman in solitary confinement under these circumstances, Defendants violated Ms. Kellerman's right to humane conditions of confinement, in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

222.     At all times material to this First Amended Complaint, the City of East Orange and County of Essex maintained polices, practices, and customs, described below and above, which were ratified by policymakers for EOPD and ECDOC with final policymaking authority, and which policies, practices, and customs were the driving force behind the constitutional violations outlined in Count Five of this First Amended Complaint.  These policies, practices, and customs included, *inter alia*:

> A.     EOPD's and ECDOC's policy, practice, and/or custom of improperly housing transgender female pretrial detainees in conditions that amount to solitary confinement, instead of with female inmates/detainees or in a separate unit designed to adequately house and protect transgender inmates/ detainees;

B.    EOPD's and ECDOC's policy, practice, and/or custom of failing to have in place a reasonable alternative to solitary confinement for the housing of transgender female pretrial inmates/detainees;

C.    EOPD's and ECDOC's policy, practice, and/or custom of failing to protect transgender inmates/detainees in solitary confinement from harm from other inmates/detainees;

D.    EOPD's and ECDOC's policy, practice, and/or custom of failing to properly train ECDOC employees on how to care for and interact with transgender inmates/detainees;

D.    EOPD's and ECDOC's policy, practice, and/or custom of condoning a culture of harassment and abuse towards transgender detainees/inmates; and

E.    ECDOC's policy, practice, and/or custom of failing to adequately investigate complaints by transgender inmates related to allegations concerning abuse and harassment.

223.    Alternatively, EOPD and ECDOC failed to have in place adequate and constitutionally mandated policies to protect the constitutional rights of Ms. Kellerman, which omission proximately and directly caused the constitutional violations set forth in Count Five of this First Amended Complaint.

224.    Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the above *de facto* policies, which proximately and directly caused the constitutional violations set forth in Count Five of this First Amended Complaint.

225.    Defendants John Doe Police Officers and John Doe Corrections Officers who participated in the placement of Ms. Kellerman in conditions that amount to solitary confinement violated her due process rights by forcing her to live in conditions that subjected her to punishment and a substantial risk of serious harm

226.    As a direct and proximate result of Defendants' constitutional violations, Ms. Kellerman suffered serious psychological harm, including severe and lasting emotional distress,

humiliation, anxiety, past and future mental anguish, past and future pain and suffering, and aggravation of preexisting injuries. The Defendants' conduct has contributed to and/or resulted in diagnoses of depression, anxiety, Post-Traumatic Stress Disorder, and Agoraphobia.

## COUNT SIX

### DUE PROCESS CLAIM FOR FAILURE TO RECOGNIZE MS. KELLERMAN AS FEMALE AND PLACING HER IN MALE-ONLY HOUSING

### (Against Defendants City of East Orange, County of Essex, Ortiz, Boyd, Green, John Doe Police Officers and John Doe Corrections Officers)

227.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

228.    Count Six is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

229.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

230.    Despite being a transgender woman and telling the EOPD Police Officers that she was "legally female"—a claim that could easily be verified—Ms. Kellerman was designated as "male" by EOPD during the intake and booking process.

231.    She was treated the same as a male detainee would be treated by EOPD, including, but not limited to: being housed in a male general population unit, searched by a male police officer, and chained to male detainees while transported to ECCF.

232.    At ECCF, following a strip to determine Ms. Kellerman's genital anatomy, Ms. Kellerman was processed as a male and placed in male units without any type of formal review of whether placement in a women's unit would be appropriate.

233. The Due Process Clause of the Fourteenth Amendment requires, at a minimum, that government action have some rational basis. Defendants' placement of Ms. Kellerman in a men's correctional unit and disregard for the fact that she is a woman and has a female gender identity is irrational.

234. Defendants' treatment of Ms. Kellerman also impermissibly burdened her fundamental rights to autonomy and privacy, including her right to live as a woman and consistent with her female gender identity. By disregarding Ms. Kellerman's status as a woman and by disregarding her female gender identity as set forth above, Defendants have also violated the Due Process Clause.

235. At all times material to this First Amended Complaint, the City of East Orange and County of Essex maintained polices, practices, and/or customs, which were ratified by policymakers for EOPD and ECDOC with final policymaking authority, and which policies, practices, and/or customs were the driving force behind the constitutional violations outlined in Count Six of this First Amended Complaint.

236. Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the policies, practices, and/or customs that proximately and directly caused the constitutional violations set forth in Count Six of this First Amended Complaint.

237. Defendants John Doe Police Officers and John Doe Corrections Officers who participated in placing Ms. Kellerman in a men's correctional unit, and who disregarded the fact that she is a woman and has a female gender identity, proximately and directly caused the constitutional violations set forth in Count Six of this First Amended Complaint.

## COUNT SEVEN

### EQUAL PROTECTION CLAIM FOR FAILURE TO RECOGNIZE MS. KELLERMAN AS FEMALE AND PLACING HER IN MALE-ONLY HOUSING

### (Against Defendants City of East Orange, County of Essex, Ortiz, Boyd, Green, John Doe Police Officers and John Doe Corrections Officers)

238.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

239.    Count Seven is brought pursuant to 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

240.    Defendants are "persons" under 42 U.S.C. § 1983 who acted "under the color of state law" and deprived Ms. Kellerman of rights secured by the U.S. Constitution.

241.    Despite being a transgender woman and telling the EOPD Police Officers that she was "legally female"—a claim that could easily be verified—Ms. Kellerman was designated as "male" by EOPD during the intake and booking process.

242.    She was treated the same as a male detainee would be treated by EOPD, including but not limited to: being housed in a male general population unit, searched by a male police officer, and chained to male detainees while transported to ECCF.

243.    At ECCF, following a strip to determine Ms. Kellerman's genital anatomy, Ms. Kellerman was processed as a male and placed in male units without any type of formal review of whether placement in a women's unit would be appropriate.

244.    By treating Ms. Kellerman as male during booking and intake, and by refusing to treat her as a woman and place her in a unit housing other female inmates, Defendants

- 56 -

discriminated against Ms. Kellerman on the basis of her sex, gender identity, and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment.

245.    At all times material to this First Amended Complaint, the City of East Orange and County of Essex maintained polices, practices, and/or customs, which were ratified by policymakers for EOPD and ECDOC with final policymaking authority, and which policies, practices, and/or customs were the driving force behind the constitutional violations outlined in Count Seven of this First Amended Complaint.

246.    Defendants Ortiz, Boyd, and Green are liable for issuing, authorizing, and/or implementing the policies, practices, and/or customs that proximately and directly caused the constitutional violations set forth in Count Seven of this First Amended Complaint.

247.    Defendants John Doe Police Officers and John Doe Corrections Officers who participated in placing Ms. Kellerman in a men's correctional unit, and who disregarded the fact that she is a woman and has a female gender identity, proximately and directly caused the constitutional violations set forth in Count Seven of this First Amended Complaint.

## COUNT EIGHT

## VIOLATION OF THE NEW JERSEY CONSTITUTION

### (Against All Defendants)

248.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

249.    For the same reasons set forth in Counts One through Seven of this First Amended Complaint, alleging violations under 42 U.S.C. § 1983 of the Fourth and Fourteenth Amendments to the U.S. Constitution, and incorporated by reference here for the purposes of

establishing that Defendants' acts violated Ms. Kellerman's rights under the New Jersey Constitution, the actions and omissions of all Defendants, who were acting under the color of state law, constituted violations of the following provisions of the New Jersey Constitution:

A.   New Jersey Const. Art. I, Section 1: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

B.   New Jersey Const. Art. I, Section 7: "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures. . . ."

C.   New Jersey Const. Art. I, Section. 12: " . . . cruel and unusual punishments shall not be inflicted."

## COUNT NINE

## VIOLATION OF THE NEW JERSEY CIVIL RIGHTS ACT

### (Against All Defendants)

250.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

251.    For the same reasons set forth in Counts One through Eight of this First Amended Complaint, alleging violations of the U.S. Constitution under 42 U.S.C. § 1983, and of the New Jersey Constitution, incorporated by reference here for purposes of the Ninth Claim for violation of the New Jersey Civil Rights Act, the actions and omissions of all Defendants, who were acting under the color of state law, constituted violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, by depriving Ms. Kellerman of rights secured by the Fourth and Fourteenth Amendments of the United States Constitution and Article I of the New Jersey Constitution.

## COUNT TEN

## VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION

### (Against All Defendants)

252.    Ms. Kellerman repeats, realleges, and incorporates by reference each and every allegation in the preceding paragraphs of this First Amended Complaint, as though fully set forth herein.

253.    The NJLAD, N.J.S.A. § 10:5-1 *et seq.*, makes it unlawful for any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation to, among other things, directly or indirectly to discriminate against any person and/or provide differential treatment on the basis of sex, gender identity, gender expression.  *See* N.J.S.A. § 10:5-12(f).

254.    EOPD and Essex County Jail are places of public accommodation within the meaning of NJLAD.

255.    Defendant Officers and CFG Employees violated NJLAD by directly and/or indirectly discriminating against Ms. Kellerman and/or treating her differently than other similarly situated prisoners who are not members of a protected class, including, without limitation, by harassing and abusing Ms. Kellerman on the basis of her gender identity and gender expression; subjecting Ms. Kellerman to cross-gender strip searches for the purpose of determining her biological sex; housing Ms. Kellerman with other males and in an environment that was dangerous to her health and safety; placing Ms. Kellerman in solitary confinement on the basis of her gender identity and gender expression and without explanation or a meaningful opportunity to respond or to challenge her placement; and/or failing to protect Ms. Kellerman

against assaults by other inmates that were motivated by discrimination against Ms. Kellerman based on her gender identity and gender expression.

256.     Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green violated the NJLAD by knowingly giving substantial assistance and/or encouragement to the unlawful discrimination of Defendant Officers and CFG Employees against Ms. Kellerman. Among other things, Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green created and/or ratified policies, practices, and/or customs that were the driving force behind the unlawful discrimination against Ms. Kellerman.  Alternatively, Defendants City of East Orange, County of Essex, Ortiz, Boyd, and Green failed to adopt the appropriate policies, practices, and/or customs to prevent the unlawful discrimination against Ms. Kellerman, with knowledge, deliberate indifference, and/or reckless disregard of the fact that the failure to do so would likely result in the unlawful discrimination against Ms. Kellerman.

257.     In addition, Defendants City of East Orange and County of Essex are vicariously liable for the unlawful discrimination of the Defendant Officers and CFG Employees, and Defendants Ortiz, Boyd, and Green, against Ms. Kellerman.

**<u>REQUESTED RELIEF</u>**

WHEREFORE, Plaintiff Kerri F. Kellerman prays that this Court issue an Order:

a)      Declaring Defendants' conduct to be unlawful in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I of the New Jersey Constitution, the New Jersey Civil Rights Act, and the New Jersey Law Against Discrimination;

b)      Awarding Plaintiff compensatory and punitive damages in an amount to be determined at trial;

d)      Granting Plaintiff an award of reasonable attorneys' fees and costs; and

e)      Granting such other relief as the Court may deem just and proper.

## **TRIAL BY JURY DEMANDED**

Plaintiff Kerri F. Kellerman demands a trial by jury on all matters so triable.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

Dated: April 1, 2019                     */s/ Natalie Janet Kraner*
                                          Natalie Janet Kraner, Esq.
                                          Reynold Lambert, Esq.
                                          Shontae D. Gray, Esq.
                                          Jarrett R. Schindler, Esq.

*Counsel for Plaintiff Kerri F. Kellerman*

## CERTIFICATE OF SERVICE

I, Natalie Janet Kraner, Esq., being of full age, hereby certify as follows:

1.      I am a senior public interest counsel of the law firm Lowenstein Sandler LLP, counsel for Plaintiff Kerri F. Kellerman in the above-captioned matter.

2.      I hereby certify that on April 1, 2019, a true and correct copy of this First Amended Complaint was filed electronically with the United States District Court for the District of New Jersey through the Court's CM/ECF System.

3.      Pursuant to Local Civil Rule 5.2 and Rule 14(b)(1) of this Court's ECF Policies and Procedures, the Notice of Electronic Filing transmitted to the following counsel of record constitutes service on all parties:

> Alan R. Ruddy, Esq.
> Office of the Essex County Counsel
> Hall of Records
> 465 Dr. Martin Luther King Boulevard
> Room 535
> Newark, New Jersey 07102
> (973) 621-5021
> aruddy@counsel.essexcountynj.org
> *Counsel for Defendant Essex County Department of Corrections*
>
> Christopher Matthew Pisacane, Esq.
> The Law Office of Christopher M. Pisacane, LLC
> 11 Pine Street
> Suite 458
> Montclair, New Jersey 07042
> Tel.:    (973) 783-7091
> Fax.:    (973) 947-2149
> cpisacane@pisacanelaw.com
> *Counsel for Defendant East Orange Police Department*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2019                                /s/ Natalie Janet Kraner
                                                    Natalie Janet Kraner, Esq.
                                                    LOWENSTEIN SANDLER LLP